The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, be seated, please. All right, the first case we'll hear this morning is the United States v. Dales. And Mr. Klepper, we'll hear from you. Thank you, and may it please the Court. Agent Gorman's affidavit was a 26-page confession. There was no probable cause. In the government's brief is a 56-page confession that this does not even pass the good faith test under the settled law that governed this case. And if this crossed the good faith standard, the government would not be claiming that Lauer was dicta. It would not be citing from the pre-sentence report to rewrite what the history was and what information was actually in front of the U.S. Postal Service inspectors at the time of the search and time of the affidavit. The most concerning thing here is, what is the stopping point for the government's argument? Because under the government's argument, the home in the electronic age would go from the most protected spot under the Fourth Circuit to the least protected spot. Under their analysis, my car would have more of a privacy right than my own home. Well, now you've got to start with a proposition. We have a judicial officer reviewing this and finding probable cause. So that severely limits it. We defer to judicial officers, and obviously if the officer got a bad affidavit, got bad information, that's one thing. And, of course, the officer still has to make the correct decision on probable cause. But I'm not sure we should be the whole idea of the search requirements that we issue warrants upon probable cause by judicial officers, and that happened here. So now you've got this task of demonstrating that the information that the judicial officer had wasn't sufficient to issue the warrant. Yes, I fully recognize the hill that I need to climb here, and I believe it's been literally 30 years since this court found that not even good faith was satisfied when it came to after the magistrate signed the warrant. And I'm here to say this is that case. This absolutely is that case. Because what happened here was this is the most sophisticated judicial of investigators here. This is somebody from the U.S. Postal Service who is trained. They know the United States v. Griffith case out of the D.C. Circuit. I find it fascinating that the government's brief doesn't even cite the United States v. Griffith case. Well, we've already distinguished Griffith, right, in the Suero case? Didn't we say that in a case like this where the offense itself involved a computer, that's different? Well, there are two points of distinction. In fact, the government also brought up United States v. Glass, which also is another case that was distinguishing Griffith and Mora. And so I want to take all this head on. What happened in those cases was that the court looked for, number one, in the officers knowing, or at least of substantial likelihood, that the defendant had a computer. First thing that happened is the defendant has a computer. We believe it's at his house, and we also believe, so you satisfy the spatial connection. There is something, there is a particular thing to be searched under the Fourth Amendment, plain text. There's the spatial nexus that says we know the computer was here at least at one time and that the files could have been retrieved at least at one time. And then there's a temporal component, which is, so in the child pornography context, you first have the collector inference, and then you have the preservation inference. And the second one applies here as well? No, it does not, Your Honor. Why not? Is there something special about this computer where you can't retrieve things? They didn't know that he had a computer here. Oh, I'm sorry, but the inference that what was once on a computer can always be retrieved applies here. And so when we're talking about the temporal link and it being cut. We're also talking about a whole bunch of documents that, in the ordinary course, people retain. Tax documents to justify tax statements and financial papers. We don't leave those behind generally when we move. We put them in a box together with our computers and cell phones, and we move them to the new location. That's sort of a fairly common-sense deal. You would expect to find those devices at the new location, and you would expect that they would be retained over time. Your Honor, they didn't know that these documents existed. What they knew is that he used cloud accounts for electronic submissions. So you have the cloud. They got access to the cloud accounts. So they had those. They knew that that means he's, you know, it's an indication that's using the Google suite of documents to create things online creates the cloud record. They had no, there were no particular papers they were searching for. I thought that, weren't there like PDFs or something of pay stubs and things like that? I thought that there was at least evidence here from which one might infer that actual paper documents were involved. If that were in there, Your Honor, that is not there on the face of the affidavit. And this is something that under the McKenzie-Jude, I believe, exception, this is some added information that they forgot to put in the affidavit. They could have come forward and done that. And they used McKenzie-Jude safe harbor on some other points where trial counts said, well, I'm actually withdrawing my motion to express on that point where you've come forward and supplemented here. These are not signed tax forms, the particular ones they're talking about here. These are like 1099s, I believe. But whatever it is, I never print out my tax forms. I check it on my computer. It's all electronic. I submit it through online. There needs to be a determination, like what tax records were they looking for? The target offense here, Your Honor, was false submission for COVID-era benefits. And what I have yet to hear is how did that ‑‑ why did they think that there was a form that existed physically that they did not have a copy of that they couldn't get from the cloud account? I have never seen a case, Your Honor, of a natural inference that you bring your papers with you when you move. There is not a case that says that. The very interesting point about this case and what really is the thing that jumps off the page and should have alerted Judge Coulson, Judge Coulson made a grave mistake here. It is the 2021 is the very last date that is even mentioned in the affidavit. And it then says, and he moved in January of 2022. And we have looked. We've been unable to surveil. We've been unable to figure out what's in this apartment. And the really telling thing is that there is the T‑Mobile that is also a component of this. And in it, what it talks about is the notion that we don't know where he's been committing these crimes. We don't know what the location is. With T‑Mobile, we're going to get the historical data and we're going to get some ongoing tracking. And we're going to find out. We're going to narrow it down. Well, didn't they have the IP address connected to the e‑mail address and know that the e‑mails were sent from his prior residence? Well, here's what we know, Your Honor, on that. There's an IP address that doesn't resolve to an e‑mail account. It resolves to a location. That location was the halfway house. There's no indication that was his computer at the halfway house. Halfway houses usually have computers for rehabilitation. In fact, it jumps off the page that they have an IP address that is connected to the crimes, the suspected crimes for the halfway house, but nothing for this apartment. They've been unable to surveil. They have no idea what is or is not inside that apartment at Anthem House. So the IP address locations that were identified, I believe there was more than one, on both occasions that the e‑mails were sent, they were sent from the halfway house? From the halfway house, Your Honor. And there was no indication in the affidavit that, oh, he had a computer. In the Glass case that the government is citing from December of 2025, they noted, oh, he had two computers. They knew he had two computers and they were, okay, we know a computer exists. Personal computers are used. We are going to, therefore, it's not just for the cell phone. They're going for the computers. We know they exist. We've got the collector inference in the child pornography context. We've got the preservation inference. But there's nothing here that in the first instance says that it's his house, his residence, his apartment, that as opposed to the other universe of places and their application for it. What other places? I guess I'm, I mean, I can understand like in a case where someone has an office or there's some other logical place where they might be engaging in this Internet-based offense. But what is the other place here? The T-Mobile affidavit, Your Honor, was to find out if there was some other place. And, in fact, the, I'm sorry. No, it's okay. So you don't have, there is no obvious alternative location in this case. Well, but you need a substantial likelihood. What we have here is. We're viewing it somewhere, and if there's no alternative place. But, Your Honor, the question is first you need to have substantial likelihood to believe that these are, that this computer, that he has the computer, that he had these printed documents in the first place, that would differ from everything else they'd already searched. Before you get those inferences from the child pornography cases, you need to first place it in the house. In the Njokum case, I really, you know, the government was saying, oh, look, Judge Bennett decided that in Njokum case that is the end of this. They weren't looking for any IP addresses or anything to link it to this apartment. Because there's another U.S. Postal Service case, the same crime. We go in, because trial counsel, like I was counseling in Njokum. No, they had the IP addresses. And when we put in our brief, they are highlighting, the government was literally highlighting the IP addresses connected to this particular residence, showing that the residence had, this residence was connected to the crime. And the message, if suppression is not granted here, is for Agent Gorman to go back to his co-agent in the Njokum case and say, remember all that stuff you put in about IP addresses? You don't need it. We're doing to, you know, don't yield the lily here. It's enough that we don't know other places where it might be. And, you know, we talk about this in the Mora case. This is one where Mora says, okay, human trafficking, we think this is going to generate paper or electronic records, all that. But you have to think that it's a nexus with the home. That is what we are looking for, the nexus of the crime with the home. And this goes back to Lauer. In Lauer, there was the, there was probably, there was definitely probable cause to believe that drugs existed and that he was a drug dealer. Couldn't he have submitted the fraudulent applications from his cell phone and they knew that he had a cell phone and the cell phone was part of the record? Yes. I mean, a lot of these applications now, you don't actually need a computer. You can have PDFs and access to documents on the cloud on your cell phone. And that's exactly all the evidence that was here, Your Honor. And they already had searched the cloud accounts. And the government does not mention Griffith even once in their brief because Griffith, as this court has quoted with approval, the cell phone is not the reason to search the house. The cell phone is the reason for a search incident to arrest. And so because otherwise, if it becomes the foot in the door, literally and figuratively, to search the entire house, then in every single case, there's always, always going to be probable cause to search the residence every time. Is that it? Let me go through quickly here. Yes. I will reserve my rest of my time.  You have some rebuttal. Sure thing. All right. Mr. Bornstein. Good morning, Judge Niemeyer. May it please the Court. David Bornstein on behalf of the United States. The issue in this case is very straightforward. Did the magistrate judge have a substantial basis to conclude that the warrant affidavit provided probable cause to get into Mr. Dales' apartment? And there clearly was for at least three main reasons. The warrant sought evidence, fruits, and instrumentalities of Mr. Dales' wire fraud offenses. There were two large buckets of things that were being looked for. Number one, financial records. What were the records of the businesses that Mr. Dales claimed to own? What were his tax documents? Where he had one set that he submitted that appeared to be fraudulent to various federal and state agencies in order to get money from them, and another set that he had filed with the IRS. What happened to the $25,000 he had received four months before moving into his luxury apartment? Where did all of that go to? That was one set of things to look at. The second, of course, this is an electronic devices crime. Everyone agrees that he must have used a computer or a cell phone in order to commit the crime. My friend just said, well, there was no proof he had used a computer, but I believe that my friend has waived that basis of his argument because in the suppression proceedings at JA231, he said the court must assume he had used a computer because he had uploaded documents to his applications. Moreover, my friend says, well, the inference must be that he only used a computer at the halfway house and he left the computer behind at the halfway house because it must have been the halfway house's computer. But again, that's belied by the record. First of all, the documents that actually netted him the $25,000 from the state of Maryland were uploaded in July 2021 after he had moved out of the halfway house eight weeks earlier. So he clearly had a computer to do that. And I believe it's a fair probability, or a magistrate judge could reasonably infer that there's a fair probability, that if you have an individual who has all these email addresses, all these Apple accounts, all these Google accounts, and he's committing frauds repeatedly with electronic devices, that he's using his own devices, and then where can those devices be found? Judge Harris says, you noted, this was not an individual with many places to go. When did the alleged criminal activity take place? When was the last allegation of criminal activity? I want to distinguish between two things. The last allegation of criminal activity as to the wire fraud offenses that were charged. Or I should say that- Or included in the warrant, I guess. So the most recent one would be September 2021, which was four months before he moved into the luxury apartment. And when was the warrant request? It was January 2023. So there was a- So it was a 15-month gap? 15 to 16 months. But the question is, was there a probable cause to believe that 15 to 16 months later that Mr. Dales would still have either the electronic devices or the personal papers or evidence of what he had done with the $25,000 in that intervening period? And I think the fair probability is, of course, he would have them and he'd have them at home. Whether they were an electronic copy or paper copy, it would be in his residence. That was a fair inference. Now, my friend says, well, couldn't they just search the iCloud account because everything is up there? I don't know where that conclusion comes from, that the defendant's iCloud account contained everything on all of his electronic devices. That is not a finding reached by the district court. It's not one reached by the magistrate. It's not one set forth in the affidavit. It's simply an assertion that is made. And I think anyone using common sense can know that when you upload a document to an iCloud account, that is something you are purposefully and deliberately uploading. You're not uploading everything that is on your device. And there is independent evidentiary value to the devices themselves because, as Mr. Dales made clear before the suppression court, he actually had an identity defense. He wanted to claim that possibly he was not the person committing these frauds. He was not the person behind the accounts. He was not the person behind the applications. Well, the surest way, or I'll say one reasonable way of proving that he was, was to grab his devices and show these were the devices logging into the accounts. At the end of the day, a 16-month period is simply not beyond the pale to assume that after 16 months that there would be simply no evidence or fruits or instrumentalities of these crimes. Well, I would think, don't you, agree that that depends on what's being sought?  I mean, I would think that if we're searching for drugs and drug paraphernalia, 16 months later at a new location would likely not be reasonable. But your argument, as I understand it, is the nature of this crime involves the use of electronic devices and financial papers and records and that it's reasonable within the scope of everybody's common knowledge that these things can be recovered from electronic devices and likely papers would be retained in the person's files. And you don't simply leave those behind when you move from one apartment to the next. Absolutely. Can I say, your colleague raised this issue about whether there's a stopping point to this argument, and as I understand it, but tell me if I'm wrong, your position would be that anytime there's probable cause that a suspect has committed fraud over the Internet, there is also probable cause to search their house. No, I don't believe it's that broad, Your Honor, because in all these Fourth Amendment cases, as you know, we attend to the specific facts, and so it depends how that individual committed the fraud. If it turns out he committed the fraud halfway around the world in an independent jaunt, there might be an issue about whether there's a sufficient nexus. Let's assume he committed the fraud. It is reasonable to infer that he committed the fraud domestically. But here we know that from the IP addresses that when he first, in December 2020, started to commit the fraud... Can you give me an example maybe of a case where there would be probable cause that a suspect did commit fraud over the Internet domestically when it would nevertheless not be okay to get a warrant to search their house? It would have to be a fact pattern, Your Honor, where there's simply not a fair probability to think that given the nature of what was done, so maybe someone who turns out to be a freelancer, a freelance hacker, who officers have reason to believe is paid to get new devices, new computers, to go to a secret location and to do everything and then to burn whatever is in that location before returning home, so there's no connection between his personal life and what he's freelanced to do. But I want to make clear that when we're paying attention to a case such as this one, we simply have to see this is an individual who got out of prison, bought a phone... I'm sorry, I'm still just trying to figure out, because that's not terribly reassuring, that hypothetical. What if the person had an office? Could you still search the home? Would it still be reasonable to assume that this happened in the home? It always turns on the individual facts of the case. What if you had just these facts, but he also had an office? I think you could go into the home if what you're looking for. So if the fraud concerned financial records and personal papers, for example, Your Honor, I believe that a magistrate judge looking at a warrant could reasonably infer, and this is the court's case law going back 40 years, starting in Anderson, that... And by the way, Your Honor, the Fourth Amendment, the guarantee behind it, and it's a very important one, it's that warrants will not issue without finding a probable cause, but since 40-plus years, Illinois against Gates, the Supreme Court has been very clear, probable cause is very important, but it's also something that must be interpreted in a common-sense light. Probable cause can be found based upon the nature of what's being looked for and reasonable inferences of where it might be stored, and if a person is committing fraud such that one can reasonably infer that the evidence of that fraud, if it is as here, personal financial documents, personal paperwork, personal electronics would be found in their home, then yes, there would be probable cause to search it. But here you have what would seem to me to be inference upon inference upon inference, because this isn't a situation where an individual lived in the same place, as in Judge Harris's hypothetical, during the period of the fraud and during the period of the alleged crime. There were different locations. That's first inference number one, that if there was a computer, they took it. It's not a situation where you have an individual that you would assume would own a computer because he was living in a halfway house, he was down and out financially, it seems. Computers are not free. So that's another inference, that he had a computer. And then the next inference is that he used that computer to commit the fraud, the same one that he potentially owned. So it's not a single inference that you're drawing, it's actually inference that is built upon one and then another and then another. So it seems to me this is one of the more extreme situations of a person committed fraud, potentially on a computer, potentially he owned it himself, potentially he moved it from one place to another, and then this is all 15 months after the last allegation of crime. I respectfully disagree with that, because again, at JA-231, that is where Mr. Dales-Below conceded that he must have used a computer in order to commit these offenses. And we also have to keep in mind that that concession included after he moved out of the halfway house. And also I think a person can reasonably infer that when a person is committing a crime, they would more likely use personal devices than non-personal devices. In any event, Your Honor, it's not a stretch to think, and this is all that it requires. Once the defendant had already conceded that he must have used a computer, once we know that he continued to use a computer after he moved out of the halfway house, which rendered unreasonable the idea that he was simply using the halfway house's computer, as you pointed out, computers have value to them. They are expensive. They're not something you simply discard, especially when you're trying to get on the ground to commit these new crimes. I believe it's fair to infer, as Judge Niemeyer said, and it's a reasonable inference that when a person has their personal electronics and paperwork, that when they move, then that's the only inference being made. And it's a common one. We set out repeatedly in the brief. You know, you can look at page 31 of our brief where we set out for financial paperwork and personal papers. You move those things with you. That's the whole reason why people retain them. Well, the difference now is that all of those things can be stored in the cloud. So I think about people... But there's no basis for that, Your Honor. Well, I think about people that use computers, that they use in a temporary location that they do not own, that they have their materials stored electronically, and they can access them electronically. And so in this day and age where most people, I think, don't keep paper copies anymore, they, in fact, many people do not keep copies of documents on their devices themselves. They upload them. They then have access to them from wherever they are. I think potentially an inference that you may have had in the past where documents were not stored in the cloud but were rather stored on devices may no longer necessarily be appropriate. So, first of all, Your Honor, the question is, what inference did the magistrate judge make? And we know that the magistrate judge made the inference that these documents, whether in hard copy or electronic form, and this evidence in general, would be found in the defendant's apartment. And was that a reasonable one, deferring to that judgment? Was there a substantial basis for it? This is not de novo review. It's simply deferring to the magistrate judge's reasonable inference. Was there a substantial basis for it? The answer is yes. Now, next, Your Honor, you said, well, isn't it all in the cloud? Again, I do not understand where that assumption comes from. My friend simply asserts it. I don't know if that's true for anyone because you have to deliberately upload documents to the cloud, and there was nothing in this record, nothing at all, suggesting that Mr. Dales uploaded everything he had to the cloud. Next, it was actually independently important to see whether or not the actual devices he had had connected to these cloud accounts and to these email accounts because Mr. Dales was saying, maybe I'm not the one behind it. Also, there was a search for the instrumentalities of the crime. In proving a case, it's actually significant to have the actual device that was used there. Was there probable cause to think that after 16 months, Mr. Dales still had that device, even if he got a new phone? Was it reasonable to think he still had it? The answer is yes. We cite a decision by Judge Posner, who says, you know, all that we're doing here is probable cause. There might be a time, if a sufficient amount of time passes, that you would think, well, a person might not have a computer from a decade ago, but from 16 months ago, there was a substantial basis to think that was the case. But I also want to shift over to the paperwork. My friend tries to make this into completely a case, only a case, about searching for a cell phone. But that was just one of the three major buckets of what was being searched for. The other one was the financial paperwork and records about the alleged businesses he had about his tax paperwork. And Judge Berner, you say, well, why should we assume that there are paper copies of that again? The question here is not, did a person know or did the magistrate judge know beyond a reasonable doubt that there were paper or electronic copies in the home? It's not even, was it known by a preponderance of the evidence? It's simply, was there a fair probability, given common sense inferences, that where would a person keep the copies of their financial documents, both the authentic ones and the fraudulent ones that had been used in the crime? And whether it is stored on a device or if a paper copy is printed out, when you have an individual who only has this one apartment, the affidavit said his DMV record showed that he owns no car. The other residential addresses he had put down were stale ones. They were ones on his ID card before he went to prison. They were his grandmother's house that was sold the day, I believe, after he got out of prison. There was a residence that my friend says was his parents, but I dropped a footnote showing that that was actually incorrect. It was an assumption made by the agent, but it turned out that it was simply two people who shared his last name. But if you look at the PSR, they're not even mentioned as family members. So, with all of that together, the magistrate judge here had a substantial basis for thinking, given that these are electronic device based crimes, given that they are based upon financial and personal paperwork and tax documents, and given the fact that this individual had gotten $25,000 as a result of one of the crimes, and then we're looking for the fruits of the crimes, what did he do with the $25,000? What did he spend it on? Where are the receipts showing where it went? Where are the actual things that he purchased? Where would he have that if the only place he has, having moved out of the halfway house, is his luxury apartment? There's a substantial basis to think that there's a fair probability that the evidence, fruits, and instrumentalities of this crime were in the apartment. Just so I make sure I understand your argument. Yes, Your Honor. You're relying now on the idea that there was nowhere else he might have been. There is no office. There's no other residence. There's no family. But none of that is necessary. No, it's not. The result would be the same even if none of that were true. Exactly, Your Honor. And the reason for that is there could be probable cause to search for multiple places. I'm just trying to make sure I understand the argument. But I'd like to show that this is actually a rather common thing. There could be probable cause to search multiple places. You know, if you're looking for a gun, it might be in one place or another. Police are not limited to having probable cause that it's only in one location. Consider an offense where there are multiple possible suspects. The officers can have probable cause to look into different suspects at the same time. My friend's idea that you can only have probable cause for one place at a time is wrong. I'd also like to underscore, my friend says, cite me a case in which a court makes the finding that it is reasonable to believe that financial records will be brought from one apartment to the next. This is the case, JA 354. Chief Judge Russell made that finding. And it's stunning that my friend doesn't grapple with that at all in his opening brief. You would think that when an independent basis for the search warrant here is that there is probable cause to search the defendant's residence for his financial records, and the judge presiding over the suppression hearing finds specifically on JA 354 that the more reasonable inference is he would bring his financial records with him instead of burning them when he left his prior residence. You need to confront that if you're going to try to overturn a suppression finding, and my friend doesn't do that at all. I actually believe that is determinative of this case. I want to just briefly cover good faith, although I believe an important thing for this court to do given the nature of my friend's argument, is to reiterate two very important points. The first important point is that we're reviewing for whether there's a substantial basis to find probable cause. We defer to the magistrate judge's determinations. The warrant itself, this is Anderson, doesn't have to directly connect the probable cause to the place to be searched because the magistrate judge him or herself may make these common sense inferences alone, and you don't actually need a pre-existing authority saying we will ratify this inference. It, again, is looking back to whether a magistrate judge, using common sense, can infer yes, where do you have your personal electronics and your personal papers and your personal residence? And I believe that underscoring that in an opinion is very important given the kind of arguments that are being made here. As to good faith, the good faith standard in order to show that any reasonable officer would glance at this warrant, under Messerschmitt, the Supreme Court case, that is it. It has to be a first glance at the warrant affidavit, and it has to be so deficient that any reasonable officer would know upon that glance that he needs to go and say, I'm sorry, I can't execute this. We need to go back to the magistrate. We need to get a new warrant. If it's something that actually has to be thoroughly read, the good faith exception applies because officers are not legal technicians. They're simply someone given a warrant, been told it's been signed off on, and if they look at it on its face and they say, yep, this looks good, the good faith exception applies, and it clearly does here. If there are no further questions of the Court, we'd ask that you affirm. Mr. Klepper. This case has less of a nexus than every child pornography case this Court has decided. Every single one. Less of a nexus. Child pornography has made our society worse in so many ways, and now what this is threatening to do is that it is going to take down the rest of our Fourth Amendment rights, even if we're not suspect of child pornography, whatever it is, because in this modern age, this cell phone, maybe that also, we've got the other data, data is being created everywhere, all the time, that's what happens, and here is the tragedy here. It would flip the Fourth Amendment to make the home less protected than other places, because under the government's argument, they were struggling to come up with a specific factual scenario where there wouldn't be probable cause to search the home, and even, they couldn't come up with anything plausible, but what they're saying is it would be a super technical fact-based exception. It would become the exception that there was not probable cause to search the home, and if that becomes a super fact-intensive exception for when you can search the home, which is what they are, in effect, arguing, that means it is flipped. Florida v. Jardines was wrong. The Framers were wrong in 1791. The home is not sacrosanct. The home is the first place you look. One of the reasons I went to law school, Your Honor, I love the Fourth Amendment. I did my first paper on the Fourth Amendment in the sixth grade, and the way I like to describe it then was that if you what the Fourth Amendment does is it means that the government goes into your house wrong. They don't have probable cause. They don't get to go through your home, and this is dating myself here, but find NFL games you have taped without the express written consent of the NFL. The risks of going into a home. We live in a world where basically everything is a federal crime, that federal crime a day calendar. Everything is a federal crime under the sun. What this does is supposed to say, before you go into a home, which is where people have their most private stuff, you need to establish a nexus, and just remember, and I say this in my brief, but I cannot stress this enough. The only cases this court see, the cases where the court has a chance to draw the line, it's only in the criminal cases. The courts, what they have done by making Bivens a dead letter, and on the state side, qualified immunity, a judge-made doctrine gets rid of the civil cases. The cases where they go in, they ruin lives. A search ruins lives. And I know I've said this, but similar things here before, I have been home when the Massachusetts authorities came to search my home. I was there. This is an unbelievable invasion of privacy, and what they are trying to do, Your Honor, is to make the home the least secure place where we can be secure in our papers, possessions. They say, well, it was the only place. Well, here's the thing. They said, he is able to afford a luxury apartment. All right, well, then maybe he's able to afford an office, too. And that's why the T-Mobile warrant, they said they were going to use that to find the historic data to try to link locations to the target offense. That's what they said they were going to do, and they had not done. I am, I'm a little, I will admit I've got a little bit of peek for them saying that things were waived at JA-231. Here was the argument. According to the Gorman affidavit, Mr. Dales lived at the halfway house from December 2020 to June 2021. Each of the alleged fraudulent loans were applied for electronically by computer during that time. Nothing in the affidavit provides the loans were applied for in Mr. Dales' phone. It goes through that. It's said most likely by computer. To the extent that records are kept for extensive periods on computers, any records, therefore, would not be at Fort Avenue, but at the VOA, at the halfway house. He would use, you know, there is no allegation, there's nothing that says he had a computer that we think we brought with him. Look, I know halfway houses. There's job training, there's stuff. There are computers there. There is no suggestion this was his computer that he was able to purchase immediately after release. Immediately going to halfway home. No suggestion. And they are just saying, well, maybe there are some papers out there. Maybe. Maybe. It's their burden to say, what are the papers? They say we waived it. I said, we've got separate sections on the cell phone and everything else in our thing. We go into that. But I just want to tell you, under their world, Lauer, in their world, child pornography has erased any line, any nexus requirement. And all of this court's statements about nexus and the pains this court has gone to draw the physical and then temporal nexus has all been dicta for over 30 years. And that is a dangerous thing because they cannot draw a principled decision. So thank you. Mr. Klepper, I noticed you were court appointed and I want to recognize that service. It's very important and we very much appreciate it. We'll come down and greet counsel and proceed to the next case. All right.  The next case we'll hear this morning is Carter v. Campbell. And Mr. Korsen, when you're ready, we'll hear from you. Yes, Your Honor. May it please the court, John Korsen here for the Wake Forest Appellate Clinic. And under Local Rule 46, it's my pleasure to introduce the student counsel who are appearing here today.
judges: Paul V. Niemeyer, Pamela A. Harris, Nicole G. Berner